UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JOHNSTON FAMILY LOUISVILLE, LLC                                    PLAINTIFF


v.                                                    CIVIL ACTION NO. 3:07CV-122-S


KENTUCKIANA YACHT SALES, INC., et al.                              DEFENDANTS


## MEMORANDUM OPINION AND ORDER


This matter is before the court on cross-motions for summary judgment (DNs 50, 52).  The

plaintiff, Johnston Family Louisville, LLC, seeks summary judgment on its claim for fraud in the

inducement to enter into the purchase of an 82' yacht.[1]  The defendants, Kentuckiana Yacht Sales,

Inc. ("KYS"), and Jefferson Yachts, Inc. ("Jefferson"), seek summary judgment in their favor on all

counts of the complaint.


### I.  The Factual Contentions of the Parties

On June 4, 2006, Larry Johnston and his son went to a boat show at the Rose Island Yacht

Club in Prospect, Kentucky.   Compl., ¶ 6.  At the show they met J. Scott Pullem, Vice-President

---

[1] Lawrence R. Johnston decided to buy the yacht in question. He formed Johnston Family LLC, a Kentucky limited liability company, specifically and solely for this purpose.  The court will refer to this entity as well as the individual as "Johnston" in this opinion.  Johnston's complaint alleges (1) entitlement to revoke acceptance, (2) breach of express warranties, (3) breach of the implied warranty of merchantability, (4) breach of the implied warranty of fitness for a particular purpose, (5) violation of the Kentucky and Indiana consumer protection acts, (6) consumer fraud, (7) entitlement to rescind the contract, and (8) entitlement to punitive damages.

of Sales for KYS and Jefferson.[2]  *Id*...Johnston indicated to Pullem that he was interested in an ocean-going vessel for personal and family use in the Florida Keys, the Bahamas, and the Carribean Islands.  *Id*., Pullem depo., p. 120.  Johnston told Pullem that he had no boating experience and had never owned a boat before.  Compl., ¶ 7, Pullem depo., p. 120.  Pullem told Johnston about an 82' Jefferson Starship Pilothouse yacht in KYS' inventory and located at Kentucky Dam Marina in Gilbertsville, Kentucky which would be suitable for island-hopping.  Pullem depo., p. 120.  The yacht was built in late 2005 for Jefferson by Her Shine Marine in Taiwan based upon drawings by naval architect Tommaso Spadolini.  Answer, ¶ 8.  The design offered an extended cabin and enclosed sky lounge on the top deck which could serve as a command center for navigation and an entertainment area for the owner and guests.  Answer, ¶ 8.  There is a question of fact whether this was the first yacht sold by KYS with the addition of an enclosed sky lounge.  This allegation is made on information and belief in the complaint at paragraph 8.  This allegation is denied in paragraph 8 of the answer.

On June 5, 2006, Johnston and Pullem traveled to Kentucky Dam Marina to look at the yacht.  While inspecting the yacht, Pullem advised Johnston that it was considered a mega-yacht, that the hull of the yacht was designed by Tommaso Spadolini and that it would be suitable for use in the Carribean Sea.  Answer, ¶ 10.  The defendants deny that Pullem represented that the yacht was "designed for cruising in any ocean in the world," as alleged in paragraph 10 of the complaint.  In his deposition, Pullem related the following exchange with Johnston concerning the hull design and its suitability for open-water cruising:

---

[2]KYS and Jefferson have the same owners and managers.  Leon Shaw is President, Jeffrey Nash is Chief Financial Officer and General Manager, David Shaw is Vice-President of Operations, and J. Scott Pullem is Vice-President of Sales.  KYS is engaged in the business of selling and servicing boats, yachts, and related marine items.  KYS is an Indiana corporation with its principal place of business in Jeffersonville, Indiana.  Jefferson is in the business of manufacturing boats, yachts, and related marine items.  Jefferson is an Indiana Corporation with its principal place of business is Jeffersonville, Indiana.

...its different than most, because most pilothouses will run seven, eight, nine knots, and these will run faster than that.  And a Mediterranean style hull is used to running from one city to another city to another city.

So, anyway, the–so he said something about–his eyebrow kind of raised up about Mediterranean.  He said, so these kind of boats are over in the Mediterranean.  I remember him saying something like that, and I said this style of boat is what Spadolini designs for Mediterranean style boats, yes, this hull.

And I said, in fact, there are people here in the United States that take and put these boats on–a company called Dockwise–and they load them on boats like in Fort Lauderdale and they take them over and offload them over in the Mediterranean, or they take them and –they'll take them around to the Pacific coast and offload them in Ensenada south of San Diego, or they will take them up to Vancouver and offload them there for people to use in different areas...

We discussed going to the Bahamas.  We discussed places that I have cruised; the Virgin Islands, which we've had charter boats in.  I discussed those particular areas of the islands down through there, and that a boat like this is common for people to cruise those areas...

I told him the boat had a Deep-V hull; it was a Mediterranean style hull...being a Deep-V, provides a softer ride in rougher seas.  And I did discuss to him the fact that in rough seas this boat is a softer ride than a flat-bottom transom or a boat with less degrees of dead rise, and that's why it was called a Mediterranean style hull.

Pullem depo., pp. 117, 120-21.

On June 6, 2006, Pullem sent Johnston a purchase order for the yacht, and faxed purchase order and warranty information to Johnston's counsel.  On June 7, 2006, KYS faxed Johnston and his counsel the warranties provided by Jefferson.  On June 7, 2006, Johnston executed the purchase order to purchase the yacht for $3,287,074.00.  Johnston made a down payment of $657,414.80 to KYS.  Compl., ¶¶ 11-13.

After execution of the purchase order, Johnston obtained the name of a captain who could pilot his yacht, Captain Murrel Skula, a very experienced captain who had previously delivered boats to Florida for KYS.  Compl., ¶ 15.  On June 28, 2006, Johnston contracted with Skula to be captain of the yacht.

On July 2, 2006, Johnston accepted delivery of the yacht at Kentucky Dam Marina. Johnston alleges that its acceptance was conditioned upon the successful completion of the initial commissioning period, the repair of vibration issues and other repair work. It further urges that acceptance was conditioned upon the defendants' representations that the yacht was seaworthy. Compl. ¶ 16. The defendants deny that acceptance was subject to these conditions, but has admitted that the vessel was transported by Capt. Skula from Kentucky Dam Marina to Utica, Indiana, on July 4, 2006 so that "certain on-going commissioning procedures and warranty related procedures" could be completed. Answer, ¶17. Johnston alleges that during this initial movement of the yacht to Utica, Indiana, Capt. Skula had concerns regarding the stability of the yacht and reported these concerns to KYS. Complaint, ¶ 18. The defendants deny that Skula had concerns about stability. Answer, ¶ 18. They state that Skula stated that the yacht was "tender," and that KYS stated that it would add additional ballast to the yacht. *Id.*

Johnston alleges the following sequence of events[3] in paragraphs 20-34 of the Complaint:

In early November Capt. Skula and two other captains, Tom Ripp and Jim McGrath, transported the yacht from Kentucky to the Florida Keys. On November 17, 2006 they departed Mobile, Alabama for Naples, Florida, crossing the Gulf of Mexico. During this open sea crossing, Skula, Ripp and McGrath noted severe stability problems. Upon reaching Naples, the captains called Pullem, Nash and David Shaw to inform them of the stability problems. They described the instability of the yacht as "spooky" and informed them that the yacht was unsafe for ocean travel.

On December 4, 2006 Capt. Skula advised Johnston that the yacht had serious stability issues, was not seaworthy, and was unsafe for its intended purposes. Johnston contacted KYS to relay the information and demand a refund of the purchase price plus the cost of improvements. On

---

[3]For the most part, these allegations are denied by the defendants. They admit, however, that the captains contacted KYS about their concerns about the yacht's operation, and that the matter was addressed with Johnston in December and January. *See*, Answer, ¶¶ 19-34.

December 6, 2006 KYS responded that it felt that the yacht was seaworthy and safe, but it wished to inspect the vessel, adjust the stabilizers and replace the propellers.  On that same date, Johnston agreed to the inspection and warranty work.

On December 20, 2006, Pullem advised Johnston that representatives of the defendants wanted to travel to Key Largo to meet with Johnston and Skula concerning the yacht.  On January 5, 2007, Johnston notified KYS by e-mail that the engines did not function properly, the work had not been done on the stabilizers and propellers, and he was unable to operate the yacht even on the intercoastal waterways during the holidays.  He reiterated that the captains maintained that the yacht was unsafe because the addition of the sky lounge made the yacht top-heavy.  He again demanded a refund of his money.  By letter dated January 11, 2007, Leon Shaw responded that the stability concern may have been caused by an imbalance in the fuel system during the crossing and wished to have a technical expert confirm or eliminate the theory.  He further noted that the stabilizer fins had been modified, thus had a compromised surface area, and would therefore be replaced.  By e-mail dated January 16, 2007, Johnston informed Shaw that Capt. Skula rejected the theory of an imbalanced fuel tank.

Johnston hired a number of experts to advise him on the propriety of installing 16 sq. ft. stabilizers on the vessel, who advised not to permit the replacement of the stabilizers.  Johnston depo., pp. 97-102.  Johnston then refused to permit this to be done, despite assurances through Her Shine and Westmar, the stabilizer manufacturer, that the 16 sq. ft. stabilizers were fully suited for the yacht.  *Id.*  Unable to resolve the dispute, Johnston filed suit against the defendants in March, 2007.

During the course of discovery, Johnston obtained documents from the defendants which were generated during the construction of the yacht.  Among these papers were a number of inspection reports from Sam Baker and Neil MacDonald, surveyors hired by Jefferson to visit the shipyard and report on the progress of the job and to ensure that Her Shine followed the production

order.  D. Shaw depo., pp. 107-08.  Three inspection reports dated 12/02/05, 12/06/05, and 12/07/05 raise concerns about the vessel's trim, noting that it was very top heavy, that it was beyond the hull's maximum design weight, the tenderness was pretty high, and that it could rock side-to-side by a person walking back and forth on the boat deck.  Baker stated on 12/02/05 that "Boat is sitting very low in the water and many of the through hulls on the sides of the hull are underwater (see pics) even the side bypasses from exhausts are partially submerged.  When fully loaded with tender, anchors, food and gear it will probably weigh at least another ton and maybe sit even lower in the water."  David Shaw responded: "The laminate schedule must be reviewed on future builds.  Too heavy maybe too top heavy review tenderness while in tank."  He noted that he was "extremely concerned about the thru hull fittings being underwater especially the exhaust bypasses."  Inspection Report 82-110-15, 12/02/05.  In the 12/06/05 and 12/07/05 reports, Baker explained, in outline form, what had been done, what he had observed, and his concerns:

> 1.  TRIM
>
> A.  THE REASON TRIM GETS BETTER WHEN BOAT IS LOADED IS THAT BOAT IS VERY TOP HEAVY AND IF YOU ADD BALLAST LOWER DOWN IN BOAT THEN WHAT EVER LIST IT HAS WILL IMPROVE.  THINK OF IT LIKE AN EMPTY BOTTLE IN WATER MORE WATER THE STRAIGHTER IT WILL BE
>
> B.  WE ADDED ANCHORS AND CHAIN AND 300KGS OF WEIGHT AFT TO SIMULATE TENDER AND BOW WENT DOWN ABOUT 2 INCHES MAKING IT SLIGHTLY BOW DOWN.  WE FINISHED LATE IN THE DAY AND COULDN'T KEEP WORKERS TO USE AS BALLAST SO WE WILL HAVE TO DO THAT TOMORROW AND CONFIRM.  I DO WORRY THAT THIS BOAT IS BEYOND THE HULL'S MAXIMUM DESIGNED WEIGHT ESPECIALLY AS EXTRA WEIGHT HAS BEEN ADDED HIGH UP.  THE BOAT HAS ONLY ABOUT A 15' BEAM AT WATERLINE AND OVER 17 ½' AT BOAT DECK.
>
> C.  THE TENDERNESS OF THE BOAT IS PRETTY HIGH CONSIDERING THERE ARE 10 TONS OF BALLAST IN THE FORM OF FULL FUEL AND WATER TANKS AND EXPECT THIS TO BECOME WORSE WHEN TANKS ARE AT HALF LOAD OR LOWER.  WITH SEVERAL WORKERS WORKING STATIONARY IN BOAT I CAN GET THE BOAT ROCKING QUITE A BIT JUST BY MY WALKING FROM ONE SIDE OF THE BOAT DECK AND BACK A FEW TIMES.  WHILE UNDERWAY WITH STABILIZERS WORKING IT

SHOULD BE OKAY, BUT AT ANCHOR OR IN MARINA ROLL MAY BE EXTREME.

Inspection Report 82-110-16, 12/06/05

1. GENERAL

...B.  AS YOU WILL SEE FROM THE BELOW REPORT THERE ARE MANY ITEMS THAT HAVE NOT BEEN TESTED AND THAT OF THOSE TESTED, VARIOUS PROBLEMS HAVE BEEN FOUND IN ADDITION TO THIS, MOST ITEMS FROM PREVIOUS REPORTS HAVE NOT YET BEEN ADDRESSED AS YARD ARE BUSY TRYING TO FINISH BOAT...

2. TRIM

A.  WITH ALL WORKERS OFF BOAT, WORKERS WERE ADDED TO SIDE DECK ABOVE AREA WHERE LEAD SHOULD BE ADDED AND FOUR WORKERS TOTALING 250 KGs WAS ENOUGH TO BALANCE BOAT (SEE PIC)  I WOULD SUGGEST ONLY 200 KG ADDED AS THERE IS AN ADDITIONAL SETTEE IN THE SALON AND IN SKYLOUNGE ON STARBOARD SIDE THAT HAVE NOT BEEN INSTALLED YET. THE FATC [sic] THAT THIS IS ALL THAT WAS REQUIRED TO CORRECT A 2 ½" TRIM PROBLEM IS IN ITSELF STILL SCARY.  THERE IS STILL ABOUT 400 KGs OF GLASS TO BE ADDED TO SKY LOUNGE AND ALL THE SETTEES AND SOFT FURNITURE.  DUE TO HOW LITTLE WEIGHT AFFECTED THE TRIM I SUGGEST THAT LEAD NOT BE ADDED UNTIL AFTER THE BOAT HAS BEEN PLACED IN WATER WITH ALL GLASS AND FURNITURE IN PLACE.

Inspection Report 82-110-17, 12/07/05

Jefferson readily admits that it did nothing to further investigate the concerns raised by Baker and MacNeil, as the collective wisdom was that there was not and is not anything wrong with the boat's stability.  Pullem testified that he personally has not seen evidence that the yacht is top heavy. Pullem depo., p. 188.  David Shaw testified as follows:

Q: Does that concern you that on an 82-foot yacht that you could get a boat rocking back and forth just by walking from one side to the other?

A: That's actually not uncommon in boats of this style.  Has a lot to do with the design of the hull bottom itself, the deep "V" design.

Q: Mr. Baker tells you that the roll may be extreme.  Did you discuss with him that concern?

A: I'm sure I discussed–I discussed all these issues with him.

Q: What did Jefferson Yacht Sales do to review whether or not the roll may be extreme on this yacht?

A: We ran the boat once we got it stateside here, and did some offshore testing with it there.

Q: What offshore testing have you done on this boat?

A: Just running the boat. Different sea conditions.

Q: What did you determine from those runs?

A: We determined that the boat was safe in our opinion.

Q: When did you do those runs?

A: After the Miami Show. We run the boat on the coast there, the East Coast. And additionally, after the Palm Beach Show, we took the boat on an over 2,000-mile run through a lot of different conditions.

Q: Who was on the boat when you did that?
A: It was my father and two of his friends.

Q: And you?

A: And myself...I was there for about two-thirds of the trip.

Q: During that trip, did you discuss any stability issues with the boat?

A: Well, we run a lot of different sea and wind conditions. And, actually, I was very impressed with the handling and sea-keeping of the boat there.

David Shaw depo., pp. 135-36.

Leon Shaw testified:

Q: And what did you do to improve that fact that the boat was too top-heavy? Excuse me, very top-heavy?

A: Well, we both concluded that the boat was still not in a finished stage, and there was some very heavy equipment still to be installed in the lower section of the boat. In fact, during this time the propellers were not mounted on the boat, and they are very – they are the very lowest pendulum. And they weigh in the neighborhood of a thousand pounds. So there was a lot of factors there that ultimately would come into play that would change this factor...

Q: Mr. Baker writes that "He's worried that the boat is beyond the hull's maximum designed weight, especially as extra weight has been added high up."...

A: For one thing, I don't think he's qualified to determine that. And that's not what we hired him for, that was not within the scope of what he was intended to report...

...I would absolutely say that th4e guy was off the wall if he made a statement like that to me, because I have had too much experience on this boat to know better than that...

Q: Well, what action, if any, did you take about this?

A: I think that I–I didn't take any particular action at that time.

Q: Did it concern you that the boat has only about a 15 foot beam at the waterline and over 17-and-a-half at the boat deck?

A: That's only at the very extreme transom. That is not a true statement.

Q: So he was wrong there?

A: Yes.

Q: How do you know that?

A: I just know the dimensions of the boat. At the deck the boat is 20 foot eight inches, so I mean, I know those numbers are not correct, you know. So I don't know where he came up with those numbers...

Q: Did you read this statement in paragraph C that "the tenderness of the boat is pretty high considering there are 10 tons of ballast in the form of fuel and water tanks and expect this to become worse when tanks are at half load or lower."...

A: Yeah. But that is my–has been my experience with all these boats. And so that doesn't surprise me.

Q: So you didn't do anything about that?

A: No.

Q: Did it surprise you that the boat rocks quite a bit when walking from one side to the other?

A: No, that is kind of typical.

Q: Is it typical that the roll may be extreme, to use his words?

A: No, its typical of a DP boat.

Q: Did you believe the roll was extreme?

A: No.

...All I remember is later at the Miami boat show we had 20-some people for a cocktail party and they were all walking around and the boat did not roll extremely.

Q: Did you ever tell Mr. Johnston that your surveyor was concerned that the hull's maximum design weight was beyond its capacity?

A: No, because it's not a true statement...

Q: Did you review Mr. Baker and Mr. MacDonald's statements...regarding the trim on the boat, the fact that this is all that was required to correct a two-and-a-half inch trim problem is in itself still scary?

A: That's another misstatement on their part, because when I did the final trimming of the boat it was about 900 pounds.  And this is after – the boat came in minus the fire extinguishing system, which was a very heavy piece of equipment.  And in addition to that we relocated the hot water system.  And so there was 900 pounds of lead used to trim the boat and it became perfect.

Leon Shaw depo., pp. 63-72.

Leon Shaw sums up the defendants' contentions in an affidavit submitted in response to

Johnston's motion for partial summary judgment.  He averred, in part:

Affiant has four decades of experience with watercraft such as the yacht in this case.  In fact, as has been previously detailed in the record, Affiant personally and extensively operated the very yacht at issue in this case prior to its sale to JFL.  Of particular note was an open water trip from Ft. Lauderdale, Florida to Mobile, Alabama during early 2006.  This was during movement of the yacht to Kentucky Lake for what was to be final commissioning.  The crossing of the Gulf of Mexico was under particularly adverse weather and sea conditions, such as would test the seaworthiness of any pleasure yacht.  During the night, we encountered repeated severe squall lines with the attendant high seas, high winds, and torrential rain.  Based upon Affiant's personal experience with the yacht and his years of experience with similar pleasure craft, Affiant found the yacht to have completely satisfactory stability and performance...

A rather extensive file is created during the construction process of a yacht such as this.  Affiant routinely reviews yacht construction files as work progresses...The four or five references to stability or weight issues mentioned in Mr. Baker's materials are but a fraction of the hundreds of issues that are routinely identified during the construction of a complex vessel such as the yacht in this case.  It is also important to note that, at the time of Mr. Baker's observations concerning stability, the yacht was not completed.  Substantial work was yet to be done, all of which had an impact on stability.  For example, various items of engine room equipment, fire suppression systems, ballast, cabin furnishings and even the propellers were not installed at the time.  As to weight, the fact that a few through hull openings in the hull were initially under the water line is just another routine matter.  Her Shine simply adjusted the position of these fittings based upon the as built weight of the yacht.  Jefferson

- 10 -

Yachts expects its inspectors to err on the side of being overly critical during the construction process. Mr. Baker's observations followed that expectation. However, they are nothing more than routine matters which were routinely reviewed and, if necessary, addressed during the construction and commissioning process.

Leon Shaw Aff., ¶¶ 3-5, 7, 9-11.

By contrast, Johnston's expert presents a diametrically opposed opinion on the stability of the yacht. The Stability Report prepared by Murray & Associates, Inc. contains the following description and conclusion:

2. Overview

The following report analyzes the intact stability of the M/Y Just Relaxing. The lightship particulars, which form the basis of the analysis, are taken based on the stability or incline test of the vessel that was conducted at Ocean Reef Club, Key Largo, Florida on Wednesday, March 28, 2007 by Murray and Associates. The test was conducted in general accordance with ASTM F1321 Standard Guide for Conducting Stability Test to Determine the Light Ship Displacement and Centers of Gravity of a Vessel as well as a detailed procedure developed by Murray and Associates in accordance with the above reference standard...

This report provides an analysis of stability of the vessel in three typical conditions of loading namely, departure, mid-voyage, and arrival. The objective is to cover the full range of operating conditions for the vessel...

The analysis of the stability of the M/Y Just Relaxing indicates the following:

1. The vessel fails to comply with 4 of 6 of the limits of the general Rahola Criteria[4] in the departure loading condition.

2. The vessel fails to comply with 4 of the 6 limits for the general Rahola Criteria in the mid-voyage loading condition.

3. The vessel fails to comply with 5 of the 6 of the limits for the general Rahola Criteria in the arrival loading condition.

4. The vessel fails to comply with the USCG weather criterion in all conditions of loading for ocean service.

5. The vessel fails to comply with the USCG weather criterion in all conditions of loading for service in partially protected waters.

---

[4]The Report describes the Rahola Criteria as "a general righting energy criteria which is based on the work of Dr. J Rahola (1939) and has been widely used and accepted as an intact stability standard. The criteria are in place for various ship types and services and are cited in international and national standards...

     6.  The vessel fails to comply with the USCG weather criterion in all conditions of loading for service in protected waters.

Further the analysis shows that a constant wind speed of approximately 37.5 knots could provide sufficient force to capsize the vessel in its lightest loading condition.

Therefore, it is recommended that the operation of the vessel be restricted to near coastal service (not out of the sight of land) and in fair weather...

Stability Report, pp. 4, 5, 8.

## II.  Analysis

### A.  Johnston Family Louisville LLC's Motion for Partial Summary Judgment

Johnston has claims, among other things, that he was fraudulently induced to enter into the contract to purchase the yacht (Count VI).  He alleges that the defendants made various misrepresentations of material facts and omitted material information in their dealings with Johnston with the intent to induce him to rely upon incorrect or incomplete information and make the purchase.  He contends that he, in fact, relied upon material misrepresentations and omissions to his detriment and was damaged when the vessel was not as represented.

Initially, we note that the parties disagree as to which law applies in this case.  The defendants contend that Indiana law applies inasmuch as the Jefferson Limited Warranty states that "This warranty is not transferable and shall be enforced according to the laws of the State of Indiana."  Warranty, ¶ 15.  This choice-of-law provision specifically applies to matters of enforcement of the Jefferson warranty, however.  What we address here is a claim of fraud in the inducement of Johnston to purchase the yacht, a claim which arises outside of any warranty provisions.

Johnston urges that under Kentucky's choice-of-law rules, Kentucky law should apply inasmuch as this jurisdiction has significant contacts with respect to the transaction.  *See, Adam v. J.B. Hunt Transport, Inc.*, 130 F.3d 219, 230-31 (6th Cir. 1997)(the basic law is the law of the forum,

which should not be displaced without valid reasons; if there are significant contacts, Kentucky law should be applied).

Johnston LLC is a Kentucky limited liability company, Discussions with Pullem occurred in Kentucky, the yacht was docked at Kentucky Lake and delivery of the yacht was made there.  It is unclear to this court from the record, as developed, where Johnston executed the purchase order. After inspecting the yacht in Kentucky, Johnston apparently flew to one of his residences in Idaho. Within a few days of seeing the yacht, Johnston signed the purchase order.  However, there is no dispute that the purchase order and warranty document were faxed to Johnston's attorneys in Kentucky for review prior to their execution.  It seems clear that Kentucky has significant contacts with this transaction, especially since the alleged misrepresentations and omission are said to have been made during the negotiations in Kentucky.  The court will therefore apply Kentucky law in evaluating Johnston's fraud claim.[5]

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of*

---

[5]In any event, it appears that Kentucky and Indiana law are in harmony, and we would reach the same result utilizing authority from either jurisdiction.

*Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

It is undisputed that Johnston informed Pullem that he wanted to purchase a boat with which he could cruise the various islands of the Caribbean, the Florida Keys, and the Bahamas.  He also made Pullem aware that he had never owned a boat before and that he lacked experience in purchasing boats.  Pullem suggested the 82' Jefferson Starship Pilothouse yacht.  Johnston claims that Pullem represented that the yacht was considered a "mega-yacht" and "was designed to cruise in the roughest seas...in any ocean in the world."  Complaint, ¶ 10.  While the defendants deny the making of this statement, Pullem admitted that he and Johnston discussed the sailing of such boats in the Caribbean and Bahamas, the Virgin Islands, and in the Mediterranean.  Pullem depo., pp. 117, 120-21.  Pullem particularly explained that Spadolini designed vessels with a Deep-V hull to provide a softer ride in rough seas, and that such were Mediterranean style boats.

While there is a question of fact concerning the extent to which Pullem represented that the Jefferson Starship Pilothouse yacht was an "ocean-going" vessel, it is clear that at a minimum, Pullem indicated that it was suitable for open-water travel.  Indeed, the defendants do not appear to deny that they represented the yacht to be an ocean-going vessel.  Rather, they contend that (1) that the yacht is seaworthy and safe, and suitable for certain open-water travel, and (2) that it did not warrant the suitability for Johnston's expressed uses, but instead required that Johnston determine for himself the yacht's suitability before he made the purchase.

The second of these contentions is addressed in Section B below, as this matter is raised in the defendants' summary judgment motion.  As for the first contention, there is a genuine issue of material fact concerning the yacht's seaworthiness, stability, safety, and suitability for open-water

- 14 -

or ocean-going travel,[6] as illustrated by the conflicting conclusions of the defendants' representatives, the Shaws and Pullem on the one hand, and Johnston's captains, Skula, Ripp and McGrath, and his experts on the other.

Therefore, there remains a genuine issue of material fact concerning what representations were made to Johnston and whether the yacht is, in fact, capable of meeting the expectations expressed by him and which formed the basis for his decision to purchase the vessel.   Johnston's motion for partial summary judgment must be denied.

Johnston contends that the defendants knew at the time the yacht was constructed that it was improperly designed and was unstable, and did not (and indeed could not) correct the problem.  He contends that the failure to reveal the known instability problem to him constituted a fraud against him, as he would not have purchased the yacht had he known of this condition.  The defendants contend that the surveyor reports which indicated that the vessel was top-heavy did not reveal a design defect, but rather a mid-construction condition which (1) was not significant at the stage of construction at which the observations were made, and (2) was corrected during the construction and commissioning process.  The defendants state that, as there is no stability problem with the yacht, there was no duty to disclose immaterial information to Johnston which was contained in routine construction reports.  There is thus a genuine issue of material fact concerning whether the defendants fraudulently concealed information concerning the stability of the yacht.

### B.  The Defendants' Motion for Summary Judgment

The defendants contend that they are entitled to summary judgment on all claims against them as they have disclaimed all warranties with respect to the yacht except those specifically set out in the Jefferson Limited Warranty document, and have limited the remedy for any covered

---

[6]All of these various terms have been utilized in the record, sometimes interchangeably.  The court does not mean to suggest herein that any or all of these conditions need to be proved.  The court merely indicates that these matters are in dispute.

warranty claim to repair or replacement.[7]  The defendants urge that KYS, the sales company for Jefferson, has no liability on the warranty claims inasmuch as the purchase order states that

> New boat warranty is clearly spelled out by the manufacturer.  All warranties extended or implied are limited to the extent of the warranty provided by the original manufacturer...The foregoing is made in lieu of all other obligations or liabilities on the part of Kentuckiana Yacht Sales, and the buyer waives all other warranties, guaranties, or liabilities expressed or implied, arising by law or otherwise (including without limitation any obligation of Kentuckiana Yacht Sales for consequential damages).

They urge that as the sales representative of the manufacturer, KYS merely passed on the warranty made by Jefferson, and specifically disclaimed any further warranty or claim for damages.  Johnston does not deny that Indiana law permits the limitation of warranties in contracts, but notes that disclaimers of implied warranties are not favored under Indiana law, and are strictly construed against the seller for reasons of public policy.  *See, Perry v. Gulf Stream Coach, Inc.,* 814 N.E.2d 634, 643 (Ind.App. 2004).[8]

Unless excluded or modified by an express and conspicuous disclaimer which utilizes the word "merchantability," the warranty of merchantability which is implied in a contract for the sale of goods by seller who is a merchant with respect to goods of that kind is not effectively disclaimed. *Travel Craft v. Wilhelm Mende GmBH*, 552 N.E.2d 443, 444 (Ind. 1990), *citing*, Ind. Code §§ 26-1-2-314, 316 (West 1980); *Agrarian Grain Co. v. Meeker*, 526 N.E.2d 1189, 1192 (Ind.App. 1988). The Indiana Code states that a term is "conspicuous" when it is written in such a manner that a reasonable person against whom it is to operate ought to have noticed it.  Ind. Code § 26-1-1-201.

Neither the KYS Terms of Sale Warranty Agreement nor the Purchase Order mention merchantability.  Jefferson's limited warranty does specifically mention merchantability in paragraph 13 of the document, but there is nothing conspicuous about its presentation.  It is one

---

[7]In light of the finding herein that a genuine issue of material fact exists concerning the facts underlying the claim for fraud in the inducement, the defendants' motion seeking summary judgment on that claim will be denied.

[8]Johnston agrees that Indiana law applies to its warranty claims.

- 16 -

word among seventeen paragraphs of words, and is not set off or otherwise identified in any way. Strictly construing the terms against the defendants, the court finds that, despite the attempts to the contrary, the implied warranty of merchantability has not been disclaimed by either defendant.

The court finds that the same conclusion holds true for the implied warranty of fitness for a particular purpose, as neither warranty agreement contains a conspicuous writing disclaiming this warranty.  Fitness for a particular purpose need not be disclaimed specifically, but must be disclaimed by a conspicuous writing.   Again, the disclaimer must be construed strictly against the drafter.  The court is unconvinced that the defendants effectively waived this implied warranty. Despite the fact that the purchase order instructs the buyer to "READ REVERSE SIDE FOR ADDITIONAL TERMS OF CONTRACT" and that the reverse side, and the separate Jefferson limited warranty are both boldly titled "warranty" documents, the terms of these documents which attempt to disclaim the implied warranty of fitness for particular purpose are not conspicuously identified among the many provisions.   *See, ie., Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1084 (Ind. 1993); *Travel Craft, supra.*; Ind. Code § 26-1-2-316(2).

Johnston also contends that there is a genuine issue of material fact concerning whether the yacht met Jefferson's express warranty that it would be free from defects in material and workmanship.  Jefferson Limited Warranty, ¶ 1.  As noted in *Travel Craft,* 552 N.E.2d at 446, "The black-letter definition of 'defective' suggests that a good may be defective as the result of some sort of imperfection or dereliction, and it may also be 'defective' when the product is not fit for the ordinary purposes for which it was sold or used."   Clearly, the conflicting evidence concerning whether the yacht is seaworthy or suitable for ocean-going travel raises a genuine issue of material fact under this definition of "defective."

The defendants contend that they did not warrant that the yacht was fit for a particular purpose because the Jefferson warranty informed Johnston that "Jefferson invites, encourages and expects each prospective purchaser to inspect the boat and parts prior to purchase, with any expert

assistance the prospective purchaser deems helpful, in order to ensure complete satisfaction with the boat and parts prior to purchase." Jefferson Limited Warranty, ¶ 4. This provision contains nothing more than a suggestion, however, that does not disclaim the implied warranty of fitness for a particular purpose. Pullem does not deny that Johnston told him what sort of travel he intended to do, and suggested the particular yacht to him. Pullem has also affirmed that Johnston told him that he had never owned a boat and was not knowledgeable about them. As already noted, there is a genuine issue of material fact concerning what Pullem and others knew about the yacht in question at the time of the negotiations over the purchase and whether the yacht is, in fact, seaworthy, stable, safe, and suitable for open-water travel.

Finally, the defendants urge that the sole remedy available to Johnston is repair or replacement of defects in material and workmanship. Johnston has refused to permit the suggested repairs, the replacement of the stabilizers, to be made to the vessel. The defendants seek judgment on Johnston's claims on the ground that a purchaser may revoke acceptance of goods under repair/replacement warranty only upon a showing of a failure by the manufacturer to meet its repair or replacement obligation. *Citing, Perry v. Gulf Stream Coach, Inc*., 814 N.E.2d 634 (Ind.App. 2004); *Moore v. Mack Trucks, Inc.*, 40 S.W.3d 888 (Ky.App. 2001).

Johnston has refused to permit the replacement of the stabilizers on the advice of his expert whose opinion is that (1) replacement of the existing stabilizers with larger ones would not resolve the existing excessive roll condition caused by high end weight distribution and below water line form stability problems, (2) the 12 sq. ft. stabilizer is the proper selection for the yacht's semi-displacement hull configuration, and (3) replacement with 16 sq. ft. stabilizers would create a drag, the result of which would be reduced cruise speeds and excessive forces to the existing fin hull foundation. (October 15, 2007 Letter from Cable Marine, Inc.). The defendants have disputed Cable Marine's findings. The defendants do not suggest that the limited warranty requires the

- 18 -

purchaser to permit experimental parts replacements or to permit measures which might diminish the value of the goods.

Additionally, both the *Perry* and *Moore* cases recognize that where a remedy fails of its essential purpose, such as where a repair or replacement is ineffective to correct the problems, the limitation of remedy will not be enforced.  The *Perry* case suggests that in deciding whether a particular limitation fails of its essential purpose, the court should "identify the purpose underlying the provision and determine whether application of the remedy in the particular circumstances will further that purpose," or whether this is an application of the provision to "novel circumstances not contemplated by the parties."  *Perry,* 814 N.E.2d at 643.  Under Johnston's evidence, which is, of course, disputed by the defendants, a reasonable jury could find that (a) the repair or replacement warranty did not contemplate flaws in the design of the vessel which rendered it unseaworthy; (2) the suggested replacement of the stabilizers cannot render the vessel free of defects in materials or workmanship because the design flaws create an inherent defect to the integrity of the vessel that cannot be corrected by the replacement of a part; or (3) the suggested replacement cannot be made without significantly altering and diminishing or degrading the original vessel, and thus would not constitute a repair or replacement, but rather a redesign which is not a remedy under the agreement.

The court concludes, therefore, that the a genuine issue of material fact exists with respect to whether the limitation of remedy fails of its essential purpose under the circumstances of this case.

<u>Conclusion</u>

The court concludes that genuine issues of material fact exist which preclude summary judgment for any party to this action.


Motions having been made and for the reasons set forth hereinabove and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motion of the plaintiff, Johnston Family Louisville, LLC for partial summary judgment (DN 50) and the

motion of the defendants, Kentuckiana Yacht Sales, Inc. and Jefferson Yachts, Inc. for summary

judgment (DN 52) are **DENIED.**

**IT IS SO ORDERED.**